The Honorable United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Court is in session. Today's case will be called as previously announced. The times will be as allotted to counsel. The case today is Nydia M. Hernandez-Gotay et al. versus the United States et al. appeal number 19-2236 and Asociacion Cultural y Deportiva de Galofino de Palia et al. versus the United States et al. appeal number 20-1084. Attorney Prado, if you would please unmute your device by pressing star six. Good afternoon and whenever you're ready Mr. Prado. Good afternoon. May I please record for the purpose of the record, Attorney Erwin Prado, together with Maria Dominguez, we have the honor to represent the Asociacion Cultural y Deportiva de Galofino de Palia de Puerto Rico, the Club Galistico de Isla Vende, and several gang cuck handlers known as cuckers or galleros. Breeders and most importantly we are speaking on behalf of those Puerto Ricans that cherish their cultural identity. We are resting in our arguments containing briefs regarding the Commerce Clause and the Territorial Clause. Today we are consuming our allocutions to highlight our arguments regarding First Amendment and due process. I will cover First Amendment and co-counsel Maria Dominguez will cover due process. Your Honor, the ban of cuck fighting imposed by section 12-616 of the Agricultural Improvement Act of 2018 infringes in the people of Puerto Rico freedom of speech under the First Amendment by prohibiting an expressive cultural tradition that dates over 300 years. Cuck fighting for a community contains substantial communicative elements that should be protected. Up until 2008, all the states comprising the great nation of the United States had banned cuck fighting in the state. While Puerto Rico legislature recognized the patrimonial values of cuck fighting for the generations that have cherished this traditional culture for over 300 years. The cornerstone of our democracy is protecting minorities in order from the majority views regarding the free trade of ideas, culture, social, economic, and political values. Now, you may ask what expressive communicative value does cuck fighting entail for the Puerto Rican people? And again, we need to understand that since this great nation was founded, animals are deemed property and property are regulated by the state. And the relationship between the American citizens and the animals has been always left to the state to decide. By 2008, there was no state approving cuck fighting. And the only ones that were engaging in cuck fighting was the territories, including Puerto Rico. Now, gay cucks are a symbol of masculinity, resilience, and self-determination. To a certain extent, the cucks that fight are an extension of their handlers. And when cuckers put their young cucks to fight, they express their honor, their prestige to their gay cuck by engaging them in fight, highlighting the fact that a loser will show his face, his race, his case and lineage. The national bird of Puerto Rico, the national emblem that basically symbolizes the Puerto Rican culture is the Puerto Rican gay cuck. Now, it has been casted for 300 years. That takes skills. That still takes craftsmanship. And cuck fighting enthusiasts in Puerto Rico are culturally naturalists. Indeed, they defend the right to fight as a right to preserve their cultural heritage, as well as their Puerto Rican citizenship and self-determination. Similarly, people in Puerto Rico don't believe in gay cucks fight. Now, those implement their own culturally inflected ideas of assimilation to the great nation. But that's the beauty of the First Amendment, that these people with different ideas are protected from doing so. Now, it is important to highlight that even the American Welfare Act contains a condonation of animal cruelty. For example, subsection D on the definition basically says that although it prohibits the animal fighting inventions in the whole 50 states and territories, it contains an exception for animals being trained to hunt other animals. That animal cruelty is condoned by the federal government, and it's trying to impose on us a sense of morality. Now, it would be perfectly legal if I trained a gay cuck to kill another gay cuck if it is for hunting purposes. Now, why did the federal government, after letting, since the beginning of this nation, the states to decide what is animal cruelty, is trying to impose their moral values on a territory that has no right to be represented in Congress? I will have to cite the only representative that we had in the Court of Appeals, Joshua Rojas, in his allocution to the fact that he was the Chief Justice of the First Supreme Court at some point, and he couldn't vote for the president, because he was a resident of Prado. It's important for me to pinpoint a federal policy that is not contained in our briefs. Can I ask you, Mr. Prado, let me just ask you just a question about standing. Could you just identify the clients that you're representing and what risk of prosecution any of breeders? We represent breeders. Why would the breeders be at risk of being prosecuted under this statute? I thought the provisions that were already in place that you're not challenging would prohibit breeding. I thought this only relates to the sponsoring and exhibiting. Well, if you read the statute, it also bans promoting, and promoting the over-the-breast of this statute will make it illegal painting, writing, anything depicting animal fights, because it will be a promotion, being a promotion of animal fighting. Our culture is full of paintings and literature promoting the gay fight as a part of our culture. Now, there is some speech that needs to be performed. It is intrinsically involved in free speech. The performance and the speech and non-speech elements have to be performed. For example, let me give you an example. A dance. How can you prohibit a dance that will not be a violation of free speech? Judge Barron, follow up. So, your theory of standing as to everyone is under the promotion provision? No, really. We understand that, aside from the promotion, the fact that the statute makes it illegal to perform it, it would violate— Putting aside the First Amendment thing for a second, I guess I'm just wondering, with respect to your Commerce Clause challenge to the statute, it's an odd challenge in the sense that it's a pre-enforcement challenge. So, in order to have standing to bring the pre-enforcement challenge, there's got to be a credible threat of prosecution under the statute. I'm just wondering what your evidence is as to all the plaintiffs, that they are at risk of prosecution. I wouldn't have thought that there's any evidence that a breeder is at risk of prosecution. But maybe I'm wrong on that. Is there anything to indicate that the promotion provision, or the sponsoring provision, or the exhibition provision, has been brought against anybody who displays art in connection with it or reads the Cox? If I may, breeding, for purposes of fighting banter, would be illegal. These provisions don't make the breeding illegal. The provisions you're challenging are not what makes it illegal, right? If I breed with a specific genetic composition in order to make a better fighter, I will understand that I will promote. These Cox are genetically engineered to fight. Excuse me, Mr. Prado. Judge Lynch, any follow-up questions at this point? No, thank you. All right. We will hear from Ms. Dominguez at this point. Mr. Prado, if you could mute your audio and video. May I proceed, Your Honors? Yes. Good afternoon. Again, Maria Dominguez representing the appellants in this case. I believe that I have seven minutes, and I will be addressing the due process argument. Your Honors, cockfighting is more than a sport to the people of this island. It is an activity that is historically deeply entrenched in the island's culture and its history. As discussed by Mr. Prado, it is an activity that has become expressive of the cultural autonomy of this island and of Puerto Ricans. It is multi-generational, passing from one generation to the next, from parents to sons and daughters and to grandchildren. In a very real sense, it represents much more than a mere duel between animals. This cultural effect of this activity is magnified perhaps due to the insular and colonial nature of this island. Section 126.16, which extended the cockfighting prohibition to the territory of Puerto Rico, where cockfighting has been permitted for hundreds of years and is highly regulated already by its local laws, violated appellants due process rights under the 5th and 14th Amendment. It ignored the island's cultural autonomy and imposed Congress's own sense of morality on the island. With the sweep of a pen, Congress eliminated an activity that has been a fundamental part of the island's culture for hundreds of years and vital to a preservation of its heritage. We all know that the Due Process Clause of the 14th Amendment provides broad language that no state shall deprive any person of life, liberty, or property without due process of law. The existence of a liberty interest, therefore, is an essential component to the appellant's due process argument. The Honorable Judge Gelpi in the District Court determined that appellants did not have a cognizable liberty interest,  and I would not belabor the point nor be repetitive in my argument. The District Court also determined that if a valid liberty interest existed, then the legislative process provided all that due process required. That is an issue that I would like to address.  On the case of Correa Ruiz v. Fortuño, 573 Fed 3rd 1, First Circuit 2009. However, I respectfully suggest to your honors that that case is an opposite to the instant case because in that case, the plaintiffs asserted that their due process rights had been violated by a local law, Law 181, that essentially lowered the mandatory retirement age by 10 years and they alleged they had not been afforded the opportunity to demonstrate their physical and mental fitness to continue to work. The court concluded that no due process violation occurs when the legislature, which creates a statutory entitlement, alters or terminates that entitlement. And that the legislative process itself provides citizens with all of the due process to which they are entitled. But Correa Ruiz involved a local law that had been passed by the legislature in Puerto Rico, in which the affected parties had meaningful representation. This case, in contrast, involves a federal law in which appellants did not have meaningful representation. This court, therefore, did not consider in the Correa decision whether the same conclusions would extend to a situation which involved a federal law of the magnitude given Puerto Rico's lack of meaningful representation in Congress. This honorable court has determined that before a significant deprivation of liberty or property takes place at state's hands, the infected individual must be forewarned and afforded an opportunity to be heard at a meaningful time and in a meaningful manner. That is from both sides. Could you just address the liberty interest? You said that you were relying on what Mr. Prado had said about the liberty interest. Does that mean you're saying the liberty interest is dependent on us determining that this is expressive conduct? I think that in our briefs, we raise various arguments. But we do believe that this is more than a sport, that it carries Puerto Rico's cultural heritage, that it is deeply intertwined with the culture of the island. For purposes of what's the liberty interest, could you just articulate, is the liberty interest dependent on it being expressive conduct? If not, then what is the liberty interest? I believe so, Your Honor, that it is expressive conduct, as Mr. Prado has argued to this court. And we do, of course, we are cognizant. If we were to conclude it was not expressive conduct, would that mean that there was no liberty interest? I believe so. Okay. I believe that would be determinative. And again, Your Honors, I was going to cite to the case of Gonzalez-Droz versus Gonzalez-Colón, 660 Fed Third 1, First Circuit, 2011. And that quoted Amston versus Moran, which is also a First Circuit decision from 1990. Of course, the Supreme Court has cautioned us that there is no rigid taxonomy for evaluating the adequacy of state procedures in a case, and that due process has to be flexible, and calls for procedural protections that are mandated by the particular situation. Of course, that's from the landmark decision of Morrissey versus Brewer. The thrust of our argument is that Congress did not afford the appellants in this case an opportunity to be heard in a meaningful manner in relation to Section 126.16. The passage of that section required greater procedural protections than were afforded to the appellants. Ms. Dominguez, let me interrupt you there for one second and ask if there are questions from the court. No. Why don't you take 30 seconds and wrap up then, Ms. Dominguez? Yes, sir. As this court is well aware, the Commonwealth of Puerto Rico does not have a meaningful representation in Congress. While it has a House of Representatives delegate who is known as a resident commissioner, this delegate does not have the same privilege as a state representative and has no voting rights. Moreover, this amendment was passed at a time when all of the 50 states had already outlawed, as a matter of local law, cockfighting. Puerto Rico was left, in essence, to fend on its own with really little political leverage because they have no vote in Congress. The disparity in privilege between a resident commissioner and a state representative is perhaps exacerbated by that. This process was unconstitutional, constitutionally inadequate. It deprived the people of Puerto Rico of an important liberty interest, and it cannot be characterized as a fair process in any way. We are hopeful that this honorable body will remedy that injustice. Thank you. And if you would mute your video and audio, we will hear from Mr. Clark. May it please the court, I'm Jeff Clark from the Justice Department here on behalf of the United States and the other defendants. I'd like to start by bringing us back to the Constitution, but I think I can do that by referring to two of Judge Barron's questions. So first, it is very important, Judge Barron, that this is a statute that was largely in its same form in 2018 when Congress adopted Section 12616 of the Agriculture Improvement Act in that already prohibited. So, you know, what was prohibited was attending an animal fighting venture or causing a child under the age of 16 to attend. Did that apply to Puerto Rico? Yes, it does. The definition of a state, Your Honor, in 2156, in 7 U.S.C. 2156 specifically defines Puerto Rico as a state. Was it enforced in Puerto Rico? Your Honor, it was enforced as to dog fighting. And up until December 2019, when the statute, this new amendment to the statute became effective, there was a special exception for places, territories, but it was only territories at that point where bird fighting was legal. But even that was limited at the time. In the appendix to our brief, we provided the 2018 version of the statute and then the current version of the statute after the new amendment became effective. If you compare those, you would see actually that the provision was not even entirely effective to allow any form of cockfighting at all in Puerto Rico, not the broad right that I think the plaintiffs are alleging. So I'm now confused just about this. I'm just trying to understand the background a little bit better. On the attendance provision that you cited in Puerto Rico, you say it applied to Puerto Rico before the new provisions. Was it enforced? Your Honor, I don't know of a case that was broader, a case that came to be recorded, but certainly that is what the text of the statute provided. So, in any event, to come to the premise, I think, of Judge Barrett's question, the only thing the 2018 amendment to the statute section 616 did was to prohibit sponsorship or exhibition of cockfighting. In light of that, could you address the standing issue then? You don't address it in your brief, but I'm having a little trouble seeing why, if that's all the current provisions that are challenged, concern, what the basis for standing of many of these plaintiffs would be as to the Commerce Clause claim. Yes, Your Honor, I think we didn't cover it. We essentially mounted a defense of the district court decision below, which we commend to you, obviously, on the merits is excellent. But, obviously, any standing issue is an issue that the court has a duty to look at and decide whether you think that the plaintiffs here have standing, and we don't think that they've done a particularly good job of lacing up how their particular injuries, given what they're engaged in, link up with exhibition and sponsorship. So, I think that is a basis on which the court could… I'm trying to find a better answer than that. One of the plaintiffs runs a cockfighting arena. I would think they would be at risk. So, you know, that's the same basis, essentially, on which we proceeded to address the merits, Your Honor. So, you know, you could pare back, at the very least, some of the plaintiffs who aren't focused on the exhibition or sponsorship issue. You would ask the question about breeders, and certainly, yeah, they don't seem to be at issue in terms of the 2018 amendment to the statute. What about a person who handles or participates as an employee of the cockfighting arena? Would they be at risk of it, the prosecution? Well, I think that they… Help us figure that out? Sure. So, I think if you look at the text of the statute, right, so, certainly, they almost certainly would be attending such an event if they were engaged in that kind of activity. Said that the attendance was already illegal. That's not being challenged, the attendance prohibition. Well, Your Honor, I think, fairly read, they, you know, they certainly have arguments that they're trying to mount against protecting the entire activity. I think since they only challenged section 12-616, logically, they can only be challenging something else, but something narrower. But I think that much of their brief, really, is a kind of facial attack on the statute. And I have to write, if we have to write an opinion, I'm just trying to get help from the government about who is at risk of being prosecuted for the provisions that are being challenged. So, Your Honor, to be clear, there's a wide swath of people who are at risk of being prosecuted under the entire statute because the statute isn't limited just to the 2018 amendment. Okay, so, I understand that. They are challenging, as you have made crystal clear, only a particular provision of federal law, correct? Yes. So, they have to be at risk of being prosecuted under that particular provision to have standing to challenge it. So, here's an example of a plaintiff who I think would fall within the 2018 amendment. You are sponsoring a cockfight for economic purposes, and therefore, it falls into 2156 F1, which is limited to an animal fight venture. I know that. That's reading the text. We have actual plaintiffs in an actual case, and I'm just trying to get a sense from the government as to these actual plaintiffs, which ones, in your view, face a credible threat of prosecution under these particular provisions, which are the only ones being challenged? Certainly, I would think the person who runs the cockfighting arena would. Is there anybody else who is a plaintiff in this case who is at risk of being prosecuted under this statute, these particular provisions that are being challenged? So, Your Honor, I have to confess that I haven't, you know, parsed each of the individual plaintiffs against the 2018 amendment. I could, we'd be happy to file a supplemental letter or brief with the court doing that and obviously invite response from the plaintiffs, but the case has been briefed, I think, both below and here on, you know, on defending against, you know, what the district court conceived of as a broader challenge. One reason it might matter to me is it might shape how we think about the Commerce Clause claim as to who the actual plaintiff before us is and what their status is. So, with respect to the person who runs the cockfighting arena, there's no question they're engaged in commercial activity in doing that. Yes. It may bear potentially on how we think about resolving the Commerce Clause issue, whether it's a facial challenge or an as-applied challenge. So, that's partly why I've been trying to get your sense of who's actually before us and what their actual claim is. But, taking just the person. There are two other plaintiffs that I was going to mention for purposes of the discussion about the Commerce Clause challenge. So, there's one who's an individual who is not in Puerto Rico who invests in game cops. We similarly would think that, you know, he may not be subject to, I guess you could read sponsorship. That is a form of sponsorship. So, if you read that, then you could say he could challenge this 2015 provision and that's commercial activity. So, it's banned. You are the government who would prosecute him. Do you read it that way? That's my question. Yes. Yeah. Yes. Yes. If you're, you know, spending money to buy game cocks that will be used in an animal fighting venture, as Congress defines it in 2156 F1, then you're subject to prosecution. As a sponsor. As a sponsor, potentially, yes. You may have other categories that you fall in depending on what other activity you engage in. There's also, you know, someone who travels to, you know, sell objects in connection with the cockfights in Puerto Rico from Florida. So, they're clearly engaged in interstate commerce, Your Honor. Is the person a sponsor or an exhibitor? That person may not qualify as a sponsor or an exhibitor. So, if you focused on the standing of that particular plaintiff, they may not be a proper plaintiff, Your Honor. But certainly, the individual sponsor— And counsel, may I please? So, who are exhibitors? Are they the people who hold the cock up in the air at a cockfighting event, exhibiting it? So, Your Honor, the term of exhibitor has, you know, been used in animal welfare statutes for a long time. It's not unique to this statute. I think we're talking about exhibition in the same sort of sense that folks would sometimes refer to a boxing match as a boxing exhibition. So, if you're sponsoring a boxing match, if you're, you know, if you're part of putting a boxing match on, then you are exhibiting an animal fighting venture for purposes of cockfighting here in Puerto Rico. Is exhibiting broader than sponsoring? Well, I mean, I think as I sit here, I'm hard-pressed to think that used in conjunction, the terms, you know, don't make clear what Congress is aiming at. Those who are attempting to profit from and leading an animal fighting venture. Yes, but I'm, you know, you were asked about the employee earlier. That's what led me to this series of questions. The employee is not the actual sponsor, but by God, that employee is exhibiting the animals and strutting around with them. And that's what I'm asking about. And surely the word exhibitor has to have a different meaning than sponsor. So, Your Honor, I would again come back to the point that while you need to focus on the 2018 provision for purposes of defining who has standing, because it goes to the sponsorship or exhibition, that's not to say that that's the full reach of 7 UFC 2156. It goes broader. I think it would cover employees under a variety of its headings, potentially depending on what happens with the employee's conduct. Yeah, but well, you still have to justify these particular provisions would help to know who they cover. So, Your Honor, I think there's clearly a core that they cover. Your Honor, they cover someone who says, I'm going to set up an animal fighting venture. I'm going to promote it. So maybe you're an advertising company. There's an easy way to distinguish between a promoter who's kind of sponsoring the event and the actual exhibitor who's running the event. I think the exhibitor more naturally covers those who are running the event, and the sponsor could cover someone who is at some level of remove, who's telling people go to the event. I take it your position is so long as any one or perhaps three of these assorted plaintiffs have standing, then the merits of the case can be resolved. Sure, if there's at least one plaintiff who has standing, then the merits can be resolved. Although I do think that if there are no plaintiffs who have any, you know, credible claim to an injury, in fact, as to a particular form of challenge that they're mounting, then you could decide, obviously, in an exercise of judicial restraint, not to reach that challenge and leave that for another day. But I don't think you, you know, as I think I was trying to make clear to Judge Barron, there probably is at least one plaintiff like that, which is why we proceeded to defend on the merits. Go ahead, Judge Howard, sorry. No, I'm sure I'm going to ask the same question. You go ahead. Well, taking, let's say, as best I can tell, you've identified one who you think is at risk of prosecution, which means we then have to get to the merits, at least as to that one. And the one who seems the clearest is the one who runs the cockfighting arena. Okay. Yes. Here's my question as to that. For purposes of the commerce clause, since it's a pre-enforcement challenge, there happens to be a jurisdictional hook in the statute. Yes. Okay. At one level, it's quite obvious that this person could be shown to satisfy that hook based on their conduct, given that they run a commercial cockfighting ring. Then we could say, well, a prosecution of that person, if the jury was instructed, you have to satisfy the jurisdictional element by proving that they run that ring. This case becomes quite easy because we have a clearly commercial activity that is at risk of prosecution, and if you aggregate that activity over time, there'd be a substantial effect on interstate commerce. But it's not evident to me, since we don't have an actual prosecution with actual jury instructions, that that's the right way to look at it, because it's at least possible, the way the jurisdictional hook is written and the way the findings read, that you could bring a prosecution against that cockfighting arena owner, and the jury instruction could read even a trivial connection to interstate commerce. The mere fact that he's dealing in birds would be enough to cover it, because the findings suggest a very broad view of what affects interstate commerce. If you took that view, then arguably, we have to reach a very different type of question about the Commerce Clause, because you'd be then reaching potentially any cockfight, even one, a little one in the backyard. That would make it look like race, and then you have all the difficulties of whether this is really a race-like analysis. So could you help me figure out how to think through that problem? Sure, Your Honor. So I suppose I don't think it's that difficult in this respect. This challenge is a challenge that they've mounted really against the statute on Globo to say that it's unconstitutional as applied to Puerto Rico. So if you look at the Commerce Clause analysis, the four Lopez factors, the factor that goes to the question of, is there a jurisdictional nexus in the statute? There is. But we have said that the mere fact that there's a jurisdictional hook sometimes can be a bit of a mirage if it's defined to encompass anything, even the non-commercial version of the activity, because the activity in gross has been found by Congress to be commercial. So if that's the case here, if that's how you're defining this hook, then the hook doesn't do very much work. And if you could prove satisfaction of the hook by simply showing he deals in birds or it's a bird bite, then that arguably picks up even the local backyard cockfight, which then raises the harder question under race. So how do we deal with that problem? So, Your Honor, I think I want to say to you on this is if you want to look at whether a particular set of facts would support a finding by a fact finder, whether judge or jury, that the jurisdictional nexus hook had been met, then you need to wait until it's actually brought in an enforcement action, a criminal action against a particular defendant and then assess whether the finding that it met the jurisdictional element is correct or not. I don't think you can look at the fact that Congress was clearly regulating commercial activity here, cockfighting, sports wagering, and the like, that it was using a jurisdictional nexus requirement. In 1976 and 2007, it had findings about the effects on interstate commerce and that these effects are clearly not attenuated. There are facts that could lead to avian flu problems, which we're now particularly sensitive to. Before you go too much further, Mr. Clark, Judge Barron, you had a follow-up. Well, I guess I'm just trying to get it. So the government could tell us what the hook means and you could give one of two answers. You could say the hook means what the findings suggest, that any cockfighting, no matter how non-commercial it is, qualifies as cockfighting that affects interstate commerce. Or you could say it depends. Sometimes we might be able to read it that way, but we might also say, no, we have to prove an actual commercial nature to the activity. Or you could say, well, we can choose how to structure the case in a particular prosecution. If you took the last view that it would depend how you framed it to the jury, I then start to question whether we even have a right case here because I'm not sure there's any plaintiff who faces a credible threat of prosecution of the kind, at least with respect to the Commerce Clause issue, of the kind that implicates the Commerce Clause. So it's really, I mean, the government knows what the hook means. It's your statute to enforce. So you tell me what it means. So, Your Honor, look, I think it should be given a broad meaning. Before I do some more parsing of the text in F1, let me say, though, that we think this rejected based on the authority that Congress had to adopt this statute as applied to Puerto Rico in the Territorial Clause, and that that doesn't raise any of these issues that you're raising about how to apply the Commerce Clause to this jurisdictional nexus requirement. Yeah, it didn't cover me. Let's stick with the Commerce Clause, though. OK, so let's talk about the statute. So, you know, the statute does indicate that an animal fighting adventure has to be something which involves sport or wagering or entertainment. We think those are all clearly economic activities. So the hypothetical of someone who has, you know, two purely Puerto Rico roosters that are fighting with each other in their backyard seems like, you know, quite a stretch to apply this statute. But I can't rule out, based on the fact that there's the clause that says inter-affecting interstate or foreign commerce, if there was an imported bird used in that particular backyard fight, if the animal, the rooster was affixed with gaffes and hooks and claws that were traded in interstate commerce, that there wouldn't be a sufficient nexus to interstate commerce. So I think that's why it has to await, you know, factual development, Your Honor. I think for purposes of the broad, you know, unglobal challenge that the plaintiffs have presented here, you know, this jurisdictional nexus requirement is sufficient to pass Lopez constitutional muster. So then let me say something about the territorial clause, because we haven't spoken much about it. We think that that is a self-sufficient reason to uphold this statute against channels. So before you do that, counsel, we've gone considerably over. And so I'm going to ask the court if they need to get into this particular issue or whether we can rest on the briefs for that. But it's your pleasure, judges. I would rest on the briefs. So we're going to go ahead and end it there. And I want to express my thanks to all counsel. That concludes the arguments for today. The session of this honorable United States Court of Appeals is now recessed until the next session of the court. God save the United States of America and this honorable court. Counsel, you may now disconnect from the meeting.